AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No. **2:19 mj 194** |
| INFORMATION ASSOCIATED WITH THE CELLULAR | ) |
| DEVICE ASSIGNED CALL NUMBER (769) 390-4000 THAT | ) |
| IS STORED AT PREMISES CONTROLLED BY AT&T | ) |
| WIRELESS | |

FILED
RICHARD W. NAGEL
CLERK OF COURT

2019 MAR 12 PM 1: 15

U.S. DISTRICT COURT
SOUTHERN DIST OHIO

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A.

located in the _____Southern_____ District of _____Florida_____, there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 287 | False Claims |
| 18 U.S.C. § 38 | Fraud involving Aircraft Parts |

The application is based on these facts:

See attached affidavit.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Delia McMullen, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 12, 2019    _____
*Judge's signature*

City and state: Columbus, OH    Kimberly A. Jolson, US Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER **(769) 390-4000** THAT IS STORED AT PREMISES CONTROLLED BY **AT&T WIRELESS** | Case No. 2:19 mj 194 |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, Delia McMullen, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **(769) 390-4000** ("the SUBJECT PHONE") that is stored at premises controlled by **AT&T WIRELESS**, a wireless telephone service provider located at 11760 US Highway 1, Suite 600, North Palm Beach, FL 33408. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require **AT&T** to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.      I am a Special Agent with the Defense Criminal Investigative Service (DCIS),
which is part of the Office of the Inspector General for the U.S. Department of Defense (DoD).  I
have been so employed for approximately 16 years.  In my current capacity, I am charged with
investigating acts of suspected DoD contract fraud.

3.      This affidavit is intended to show only that there is sufficient probable cause for
the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit,
there is probable cause to believe that violations of Title 18, United States Code, to wit: Section
1001 (making false statements); Section 1343 (wire fraud); Section 287 (making a false or
fraudulent claim against the U.S); and Section 38 (fraud involving aircraft parts) have been
committed by **Military Defense Systems Inc. (MDS)**, **Am-Met**, **Robert O. Klein**, **John Amos**
and other known and unknown persons and companies.  There is also probable cause to search
the information described in Attachment A for evidence, instrumentalities, contraband, and/or
fruits of these crimes further described in Attachment B.

## PROBABLE CAUSE

*Contracting Process*

5.      The United States Department of Defense (DoD), contracts through its various
agencies, such as the Defense Logistics Agency (DLA).  DLA is the United States' combat
logistics support agency, and as such manages the global supply chain for all military services,
10 combatant commands, other federal agencies, and partner and allied nations.  DLA has three
primary depots that manage the military's global supply chain – DLA Land and Maritime

(L&M) in Columbus, Ohio, DLA Aviation in Richmond, Virginia, and DLA Troop Support (TS) in Philadelphia, Pennsylvania.

6.     When the DoD determines that a particular part is needed, the DoD issues "Solicitations," or Requests for Quotation (RFQs) electronically through a web-based application, DIBBS (DLA's Internet Bid Board System).  Users (potential contractors) are able to search for, view, and submit secure quotes based upon the RFQs for the items DLA is looking to obtain.  The solicitations (RFQ's) list the DoD requirements, which can include drawings and/or specifications such that any potential contractor is aware of exactly how the part is to be made or where they can obtain the part.  DoD contractors are required to have a quality control system in place to insure the parts supplied to the DoD are in accordance with DoD drawings and specifications.  In addition to noting the contractor's agreement or disagreement with the requirements of the solicitation, the quote, or bid, submitted will list the contractor name, business location and an email address.

7.     In order to conduct business with the DoD, contractors must register in the System for Award Management (SAM), to include providing an email address, and agree to receive payments electronically.  The contractors must also obtain a Commercial and Government Entity (CAGE) code.  The CAGE code is a 5-character identification number used extensively within the federal government, assigned by the DLA.  The CAGE code is used to support a variety of mechanized systems throughout the government and provides a standardized method of identifying a given contractor facility at a specific location.

8.     In the contracting process, once parts are shipped to the DLA, contractors enter the shipping and invoicing information electronically, through a secure, web-based system, which allows the government to receive and pay electronically.  Upon receiving the invoice, the

DoD, through the Defense Finance and Accounting Service (DFAS), Columbus, Ohio; in the Southern District of Ohio, will issue electronic payment to the supplying contractor and retain a voucher as a record of the payment.

9.    DLA L&M in Columbus is also home to laboratories used to test and identify nonconforming parts sold to DLA, including the capability to test for counterfeit material, substitute inferior products, and remark/over brand items. These laboratories at DLA L&M are used to test all suspect parts provided to DLA worldwide.

*Background of the Investigation*

10.    This investigation dates back to at least 1997 and involves a group of individuals that have been defrauding DLA by providing blatantly defective replacement parts for U.S. military weapon systems. The scheme to defraud involves setting up a company for the purpose of bidding, often the lowest bid, on DLA contracts via DIBBS. When awarded a DLA contract, the company provides defective parts to the DLA, but submits an invoice certifying their compliance with the contract, which then leads to payment before any of the bad parts can be detected. Once a company is discovered providing bad parts, it is debarred and a new company is formed to take its place.

11.    During the last 15 years, DLA L&M has identified approximately 50 companies and individuals selling bad parts (primarily through part testing) and debarred each company and its principals. It also appears that each subsequent company established may be using fake or false names for its owners or principals to avoid detection.

12.    Over time, there has been an effort to identify and link together many of the companies and their principals through same or similar addresses, phone numbers and employee names. The addresses and phone numbers of the companies involved have spanned several

states, including Colorado, Texas, Florida, Louisiana and Mississippi. Additionally, the addresses have often been empty lots, vacant buildings, or non-existent addresses, and the companies appear to have had little to no manufacturing ability.

13.     The most recent iterations of companies used by this group are **Military Defense Systems Inc.** (**MDS**) and **Am-Met**. Prior iterations include:

a.  JN&N Inc., Advanced Technology, Fluid Devices Ltd., Advance Technologies Ltd., Charles T. Pace, and Bron Lee Strokes, all of which were debarred in December 2003 for three years for providing defective parts to the DLA on contracts issued as early as 1997;

b.  Transwestern Resources Corporation, George Pattison, Advanced Technologies, Sunpool Manufacturing Company, Sara Steihl, Robert Steihl, Linda Lee, JN&N, and Charles Pace, all of which were debarred in November 2010 for 10 years for providing defective parts to the DLA;

c.  Eurometals SA Ltd., Skyvara Foundry Ltd., Herbert Harvey, Claude Bernard, Richard Skyvara, and Bernard Skyvara, all of which were debarred in August 2011 for three years for providing defective parts to the DLA;

d.  Zero Recoil Factors Inc., Metal and Machine Institute Inc., and TNT Engineering Ltd., all of which were debarred in May 2012 for three years for being affiliated with previously debarred companies;

e.  Omni Tec LLC and Nolen Materne, which were debarred in March 2013 for three years for being affiliated with previously debarred companies;

    f.   Burch Technical Institute, Cameron Duchman, and Clinton Gibson, all of which were debarred in August 2013 for three years for being affiliated with previously debarred companies;

    g.   Highlands Manufacturing Institute and William Teach, which were debarred in October 2013 for an indefinite period for being affiliated with previously debarred companies;

    h.   Stealth Equipment Instructor Inc. and William Smith, which were debarred in November 2013 for an indefinite period for being affiliated with previously debarred companies;

    i.   Ace Service and Supply Corp, Howard Stein, Eric Stein, and Mark Gold, all of which were debarred in 2014 for providing defective parts to the DLA; and

    j.   Sydabon Mfg. Inc., Bena Lobe, Leonard Lobe, Dalton Reme. Russel Thurston, Lela Thurston, Sydabon Manufacturing Co., John Amos, Debra Namias, and Robert Klein, which were debarred in 2014 for three years for providing defective parts to the DLA.

*Targets – Individuals*

14.    Although it appears several of the individuals associated with the fraudulent companies are fake names, **John Amos** and **Robert O. Klein** are two names that are consistently related to the debarred companies and believed to be actual people.

15.    Specifically, the evidence indicates that **Amos**, born in 1934, and **Klein**, born in 1937, have been operating companies engaged in DoD contracting fraud, to include owning and managing **MDS** and **Am-Met**.  Both targets reside in the New Orleans, LA area; though at least **Klein** may also have secondary residence or property in Colorado.  On January 9, 2019, DCIS

agents interviewed two former employees of **MDS**, both of whom positively identified **Amos** and **Klein** in unmarked driver license photographs.

16. Both former employees also confirmed that **Klein** was the owner of **MDS** and **Amos** was the manager. The former employees explained that Chad Myers also regularly works for **Klein**; Myers setup and maintains IT equipment at **Klein's** primary business office, located at 621 Bonita Drive, Chalmette, LA 70043, and manages Klein's largest customer, DoD contractor JBL System Solutions LLC (JBL). **Amos** actually admitted to one of the former employees that **Klein** used fake names for the owner(s) of some of his businesses. **Amos** said that **Klein** was the real owner of **MDS**, and Ada and Bryan Wolfe, the purported owners of the company, were fake names used by **Klein**. **Klein** disputed this allegation to the employee, but **Amos** explained that **Klein** used fake names because neither he nor **Amos** could represent **MDS** as both were debarred. **Amos** also admitted that **Klein** hired an actor once to play the role of Bryan Wolfe at an inspection conducted in connection with a DLA contract for which **MDS** was providing parts.

17. **Amos'** connection to the debarred companies is significant as there is evidence of:

   a. his signature on Certificates of Conformance received by DLA from Machine Institute, Zero Recoil, and Transwestern;

   b. his employment at Transwestern as evidenced by two Corrective Action Request (CAR) letters from the Defense Contract Management Agency (DCMA) addressed to **Amos;**

   c. his listing as the registered agent for Southwest Engineering, Ltd. which is an alternate name used by TNT Engineering (currently debarred as an affiliate of Transwestern); and

   d. his listing as the registered agent of Sydabon Manufacturing Ltd.

18.     **Klein** also has a strong connection to the debarred companies, as follows:

a.   he was identified as a principal of JN&N in a trip report by a contracting officer documenting a meeting at the company, which took place on January 18, 2002;

b.   he also submitted quotes to DLA and responded to correspondence on behalf of JN&N;

c.   he appears to have purchased Transwestern in January 2010; and

d.   his name was at the top of documents faxed to a DLA L&M contracting officer in 2011 by Eurometals.

19.     During the interview of the two former **MDS** employees, one of whom worked for **MDS** during December 2016 through July 2017, and the other during March – July 2017, they stated that **Klein** and **Amos'** base of operations was a small machine shop and office located at 621 Bonita Drive, Chalmette, LA 70043. They stated **Klein** started other businesses with other addresses because he could not use the 621 Bonita address as it was the address of some of **Klein's** previously debarred companies. The former **MDS** employees stated that at this location was a file server on which the majority of **Klein's** business documents were stored. They also stated there were a few desktop computers on which **Amos** and Myers work.

20.     On January 10, 2019, DCIS agents conducted surveillance at 621 Bonita Drive, Chalmette, LA 70043. Situated on this property is what appears to be a small machine shop. Six vehicles were parked directly outside of the shop. Three of these vehicles had license plates registered to International Leasing, 313 Telly Road, Picayune, MS 39466. These three vehicles consisted of one white Lexus and two white Ford pickup trucks.

21.     A search for International Leasing on Mississippi's Secretary of State website revealed that International Leasing Corp was incorporated in Mississippi in August 2018 and **Klein** is the Director of the company.

*Target Companies*

**MDS**

22.     On January 19, 2015, soon after Sydabon and related entities were debarred, **MDS** was registered in SAM to do business with the government.  The physical address initially listed was 11030 Chef Menteur Highway, New Orleans, Louisiana 70124.  In or around January 2017, **MDS'** physical address was changed to 1817 Palestine Road, Picayune, Mississippi 39466. Throughout this time, Ada Wolfe was identified as the President of **MDS**, Bryan Wolfe as the Accounts Receivable Point of Contact (POC) and Government Business POC, and Donald Wolfe as the Electronic Business POC.  The sole email address entered for all three of these contacts was military_defense_systemsinc@yahoo.com.

23.     On December 27, 2018, your affiant queried Mississippi's Secretary of State website for **MDS**, which showed that **MDS** was not incorporated until December 2, 2015.  The Incorporator is listed as Robert Klein at 313 Tully Street, Picayune, MS 39466.

24.     On January 10, 2019, DCIS agents visited the address of 313 Tully Street, Picayune, MS 39466, and learned that it was a business that provides mailboxes and other mail services.  Agents interviewed the Business Manager, who advised that Robert O. Klein had opened a mailbox there several years earlier.  A review of records provided by the manager revealed that this Robert O. Klein had a birthdate matching **Klein**, who is a subject of this investigation.

25.     During 2015-2016, **MDS** received approximately $449,000 in DLA contracts. DLA L&M tested parts, some critical application items, from 11 different DLA contracts received by **MDS** and all parts failed. Based on these failures, in July 2018, DLA debarred **MDS** and its three principles (suspected to be fake names) – Ada, Bryan and Donald Wolfe. These 11 contracts are valued at approximately $85,000. MDS invoiced the DoD and received payment for these contracts. A critical application item is an item on a U.S military weapon system that is essential to the weapon's performance, operation, and/or the preservation of life or safety of operating personnel.

26.     In its bids for the above 11 contracts, **MDS** certified to DLA that it was the manufacturer for the parts it was quoting to DLA, and that it would manufacture parts in accordance with the appropriate drawings and specifications. The email address entered for each bid was military_defense_systemsinc@yahoo.com.

27.     Finally, there are instances of interactions between DLA, DCMA and other contractors that suggest **MDS** is not a legitimate company doing business with the DoD. For example, in addition to bidding on their own contracts, **MDS** allegedly also provided parts as a subcontractor to other government contractors for use by the military. In December of 2016, a Quality Assurance Representative (QAR) from DCMA reached out to JBL regarding their use of **MDS** as a subcontractor on a DLA Aviation contract. Specifically, the QAR noted in an email to officials at JBL that the facility of manufacturer mentioned in the contract (**MDS**) does not exist; he went on to explain that the address listed of 11030 Chef Menteur Highway (which was also the address listed in SAM for **MDS**) is Diesel & Hydraulic Services Co., Inc. In fact, the QAR noted in the email that when he entered the facility in 2015, no one inside knew of a company called Military Defense Systems either.

28.     In January of 2017, JBL notified a DLA contracting officer that **MDS** had changed its location to 1817 Palenstine Road, Picayune, MS 39466. Two QARs actually went to the location at the end of January 2017 to conduct an inspection. In an email after the completion of the inspection, one of the QARs wrote that, in part, that "[t]he individual in charge identified himself as John Amos and he confirmed that this was in fact Military Defense Systems and stated that they were in the process of moving from Chef Hwy in New Orleans. He also stated that the work they were doing wasn't for the government. Long story short these guys can't manufacture anything in the current state of the facility. There is no power or water to the building. They were using a little portable generator to power the hot knife to seal the stuff they were packaging…they were a couple pieces of equipment, two drill presses and 4 lathes that in all honestly looked more like they were abandoned rather than brought in. I expressed my concern about there being no capability to meet the requirements of our three contracts. Mr. Amos said he would have Mr. Wolf, the company VP, contact me…" The QAR also noted that his co-inspector recognized **Amos** as the same individual who would present product for inspection to DCMA on behalf of Eurometals, which was debarred in October of 2011. To follow up on the possible involvement of a debarred Mr. Amos with **MDS**, in April of 2017 a contracting officer reached out to JBL for confirmation that the Mr. Amos that was present for the inspection was not the excluded or debarred Mr. Amos affiliated with Eurometals. JBL responded and attached an email between JBL and Bob Klein with **MDS** at the subject email address of military_defense_systemsinc@yahoo.com, wherein JBL noted a prior phone call with Bob Klein confirming that Mr. Amos is not the excluded John Amos. JBL asked for the same verbal confirmation to be put in an email. Klein responded and wrote, in part, "Confirmed. Regards, Bob Klein Military Defense Systems."

**AM-MET**

29.     On March 30, 2017, **Am-Met** was registered in SAM to do business with the government.  The physical address initially entered for SAM was 166 Thompson Road, Suite 2, Houma, Louisiana 70363.  Rex Larue was identified as the Owner of **Am-Met**, Trinity Cuevas as the Accounts Receivable Point of Contact (POC), Electronic Business POC and Government Business POC.  The sole email address entered in SAM for **Am-Met** is ammetqra@gmail.com.

30.     **Am-Met** established its CAGE code in April of 2017 and as of December 2017, listed its POC as Rex Larue at 212 Gemini Court, Houma, LA 70360.  A review of **Am-Met's** CAGE code information in December of 2018 revealed that Trinity Chauvin is now listed as the POC and the address is 166 Thompson Rd., Suite 2, Houma, LA 70363 (which matches the address listed in SAM).

31.     On January 6, 2019, DCIS agents conducted surveillance at the Gemini Court address, which appears to be a small machine shop.  Agents also interviewed a neighbor adjacent to this address, and determined that **Am-Met** is no longer operating at the Gemini Court address.  Per the neighbor, **Am-Met** operated out of this address for about one year, and moved out approximately four months before the date of the interview.

32.     On January 9, 2019, DCIS agents conducted surveillance at the address of 166 Thompson Rd., Suite 2, Houma, LA 70363, further described in Attachment A, and observed a white Chevrolet Silverado and a Black Chevrolet Malibu parked directly outside of the entrance to Suite 2.  The Silverado is currently registered to Troy Chauvin, and the Malibu is currently registered to Trinity Cuevas and Troy Chauvin.

33.     **Am-Met** began bidding on and obtaining DLA contracts in 2018.  **Am-Met** received a total of 10 DLA contracts during February through October 2018.  The total value of

these contracts is $88,436.  A review of DLA contracts also revealed that since MDS'

debarment, JBL Systems Solutions LLC (JBL) has also began selling **Am-Met**'s parts to DLA.

DLA is currently pulling **Am-Met**'s parts from stock for testing – both parts sold directly by

**Am-Met** and parts sold indirectly through JBL.  A review of several of the **Am-Met**'s bids for

the above contracts revealed the bids were submitted by Rex Larue.  In some bids **Am-Met** used

the email address of ammetcorp@gmail.com; in others, **Am-Met** used the email address of

ammetqra@gmail.com.

      34.     On December 20, 2018, I reviewed a Certificate of Competency (CoC)

Application (Attachment) that **Robert Klein**, the purported Owner of **Am-Met**, submitted to the

Small Business Administration (SBA) in June 2018.  **Am-Met** submitted the CoC Application to

the SBA after DLA Troop Support (TS) determined that **Am-Met** was not responsible enough to

receive the contract for DLA TS solicitation SPE8EF-17-T-3027, valued at $122,400, for wheel-

track chocks.  According to a CoC determination letter issued by the SBA to **Am-Met** in

response to **Am-Met**'s application, the SBA determined that **Am-Met** "did not demonstrate the

requisite responsibility necessary to undertake the prospective contract."  In the letter the SBA

made the following significant points:  The financial information submitted by **Am-Met** with its

CoC application was either unreliable or inconclusive, and DCMA's pre-award survey found

**Am-Met's** production capabilities were unsatisfactory.

      35.     In **Am-Met's** CoC application package was an Information for Small Business

Size Determination form completed by **Robert Klein**.  This form included the following

pertinent information on **Am-Met**:

        a.    The 100% Owner of **Am-Met** is **Robert Klein**, who is also the President of the

           company.

    b.   The phone number, email address, and physical address listed for **Klein** are (769) 390-4000, ammetengineering@gmail.com, and 166 Thompson Rd., Suite 2, Houma, LA 70363.  The business address for **Am-Met** is 212 Gemini Ct., Houma, LA 70363.

    c.   **Am-Met** produces two major products: motor vehicle parts (75%) ad valves and fittings (25%).

36.    Also in **Am-Met**'s CoC application package was **Am-Met**'s actual Application for CoC, completed by **Klein** on June 6, 2018.  This application included the following pertinent information:

    d.   **Am-Met's** President is listed as **Robert Klein**.  **Am-Met's** address and phone number are listed as 212 Gemini Ct., Houma, LA 70363, and (985) 709-0626.

    e.   A Point of Contact listed at **Am-Met's** address is "Troy".

    f.   The total number of employees listed for **Am-Met** is eight.

    g.   Cash on hand in **Am-Met's** bank account is listed as $70,113.

    h.   **Robert Klein** is listed as the 100% owner of **Am-Met** and his net worth is $1.16 million.

37.    Also included in **Am-Met's** CoC application was **Am-Met's** Articles of Incorporation, reflecting that the company was formed in Louisiana on December 27, 2016.  Rex Larue is listed as the company's Registered Agent and Director.  **Robert Klein** is listed nowhere in **Am-Met's** Articles of Incorporation.

38.    Also included in **Am-Met's** CoC application was **Am-Met's** 2017 tax return. The return was self-prepared by **Robert Klein** on June 10, 2018.  The return includes the following pertinent information on **Am-Met**: **Am-Met's** gross receipts were $1.65 million, gross

profit was $731K, ordinary business income (after deductions) was $20K, and the business is described as a manufacturer of vehicular components.

39.     During the January 9, 2019 interview of two former **MDS** employees, agents also learned that **Klein** emailed the employees from multiple different email accounts about **MDS** business. They also stated that **Klein** stored company documents on Google Drive's cloud service.

40.     On December 13, 2018, a DCIS agent reviewed a list of dates and times when **AM-Met** used specific Internet Protocol (IP) addresses to access DIBBS during 2018. These IP addresses included 104.37.234.249, 75.65.136.140, 68.191.89.20, 47.25.7.67. A public source "Whois" query revealed that 68.191.89.20 and 47.25.7.67 were registered to Charter Communications. Documents provided by Charter Communications pursuant to a subpoena revealed that on the dates and times when these two IP addresses were used to access DIBBS, they were used by **Am-Met** at 166 Thompson Road, Suite 2, Houma, LA 70363.

*Search Warrant*

41.     During a January 9, 2019 interview, two former MDS employees stated that **Klein's** cell phone number is that of the SUBJECT PHONE. They stated **Klein** used his phone frequently for business. They provided numerous email accounts used by **Klein** for business, and explained that **Klein** accessed each of them with his phone.

42.     On February 28, 2019, DCIS and Internal Revenue Service, Criminal Investigations (IRS CI), agents executed a federal search warrant at 621 Bonita Drive, Chalmette, LA 70043, a machine shop used by **Amos** and **Klein** for many years for **Klein's** various companies, most of which have been debarred at some point by DLA. During the warrant, DCIS cyber agents made an image of John Amos' phone. Review of this image

revealed that the SUBJECT PHONE belongs to **Klein.** It also revealed frequent instant messages and phone calls between **Klein** and **Amos.**

43.     During the search warrant, agents interviewed **Amos** for approximately one hour. During the interview, at approximately 10:09 AM, Amos received a call from Klein and answered, "Hello. Bob, yes sir." After the call, **Amos** told the interviewing agents that Klein would not like him to say anything else without an attorney present. The image of **Amos'** phone confirmed the incoming call from the SUBJECT PHONE.

44.     The investigative team has had difficulty in locating **Klein's** residence, where he is suspected of performing the majority of his business electronically. The team has reviewed numerous documents electronically submitted to the government – believed to be submitted by Klein – in relation to **Klein's** companies. These documents included, for example, numerous electronic SAM submissions for **MDS** and **Am-Met, Am-Met's** CoC application, and numerous emails sent to DCMA QARs, believed to be sent by **Klein.** The addresses used in all of these submissions are either those of **Klein's** small machine shops, or one of a series of virtual mailboxes used by Klein. Vehicles owned by **Klein** or his businesses are registered to a virtual mailbox. Documents obtained from **Klein's** bank accounts as well as ISPs utilized by **Klein** or his businesses are also registered to either one of **Klein's** shops or one of his virtual mailboxes.

45.     The production from a historical cell site search warrant on the SUBJECT PHONE would allow agents to determine where **Klein's** phone was located during the last few months, which would likely identify where he has conducted the majority of his electronic business, believed to be his residence. Agents could specifically determine **Klein's** location when he was suspected, for example, of making false electronic statements to the government in emails. Agents could also determine where **Klein's** phone was located when he logged into

DIBBS to submit quotes to DLA. **Klein's** location – and confirmation of – the call placed to **Amos** on the day of the search and interview could also be determined. If **Klein's** phone is located at a single location on most dates when he was doing electronic business with the government, there would be probable cause to search this location.

46.     In my training and experience, I have learned that AT&T WIRELESS is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

47.     Based on my training and experience, I know that AT&T WIRELESS can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as AT&T WIRELESS typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

48.     Based on my training and experience, I know that wireless providers such as AT&T WIRELESS typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as AT&T WIRELESS typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

49.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

50.     I further request that the Court direct AT&T WIRELESS to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T WIRELESS, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

51.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents

because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

Delia McMullen
Special Agent
Defense Criminal Investigative Service

Subscribed and sworn to before me on _March 12_, 201_9_

Honorable Kimberly A. Jolson
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number **(769) 390-4000** ("the Account") that are stored at premises controlled by **AT&T WIRELESS** ("the Provider"), located at 11760 US Highway 1, Suite 600, North Palm Beach, FL 33408.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period of January 1, 2019 through the present.

    a.    The following information about the customers or subscribers of the Account:

        i.    Names (including subscriber names, user names, and screen names);

        ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.    Local and long distance telephone connection records;

        iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.    Length of service (including start date) and types of service utilized;

        vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

   b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        ii.  information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 18, United States Code, Section 1001 (making false statements), Section 1343 (wire fraud), Section 287 (making a false or fraudulent claim against the U.S), and Section 38 (fraud involving aircraft parts), those violations involving **Am-Met Corporation, Military Defense Systems Inc. (MDS)**, **Robert O. Klein**, **John Amos** and other known and unknown persons and companies, including those previously identified companies having been debarred by DLA, including

- Adam Wolfe, Bryan Wolfe, and Donald Wolfe and Chad Myers, Rex Larue, Trinity Cuevas and Troy Chauvin (associated with MDS and Am-Met);
- JBL Systems Solutions LLC, including Joseph Lazzari;
- JN&N Inc., Advanced Technology, Fluid Devices Ltd., Advance Technologies Ltd., and Charles T. Pace;
- Transwestern Resources Corporation, George Pattison, Advanced Technologies, Sunpool Manufacturing Company, Sara Steihl, Robert Steihl, Linda Lee, JN&N, and Charles Pace;

- Eurometals SA Ltd., Skyvara Foundry Ltd., Herbert Harvey, Claude Bernard, Richard Skyvara, and Bernard Skyvara;
- Zero Recoil Factors Inc., Metal and Machine Institute Inc., and TNT Engineering Ltd.;
- Omni Tec LLC and Nolen Materne;
- Burch Technical Institute, Cameron Duchman, and Clinton Gibson;
- Highlands Manufacturing Institute and William Teach;
- Stealth Equipment Instructor Inc. and William Smith;
- Ace Service and Supply Corp, Howard Stein, Eric Stein, and Mark Gold;
- Sydabon Mfg. Inc., Bena Lobe, Leonard Lobe, Dalton Reme, Russel Thurston, Lela Thurston, Sydabon Manufacturing Co., and Debra Namias;

and occurring after January 1, 2019.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T WIRELESS, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T WIRELESS. The attached records consist of _____ [GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T WIRELESS, and they were made by AT&T WIRELESS as a regular practice; and

b.      such records were generated by AT&T WIRELESS'S electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T WIRELESS in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by AT&T WIRELESS. and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____

Date                                              Signature

2